All right. Good morning. It's April 1st. Other than that, we're staying within the lanes, straight down the line. No April Fools or whatever. But good morning. Welcome to the West Courtroom. I am extremely honored to have Judge Gene Davis on the right, Judge Jennifer Elrod helping with the cases this week. We have a varied docket, as we sort of always do. Can't beat this job for variety. So we have 20 cases, a full mix. Cases we've picked for argument are ones that we look forward to the good advocacy. We have, what, four panels sitting this week, so it's a robust week. So the rules are straightforward. All of you are veterans in terms of the light and so forth. The one I'm told to remind is just stay in the microphone. We have become dependent on listening to the oral argument tapes and so forth. So if you wander, sometimes that's difficult. But other than that, we're ready to go. All right. We'll call the first case up. United States v. Tello. Mr. Martin. May it please the Court, my name's Scott Martin. I represent Rafael Tello in this appeal of the District Court's denial of his motion to suppress evidence derived from a stop of his tractor trailer at an interior immigration checkpoint south of Falfurrias, Texas. Mr. Tello argues that a Border Patrol agent in the primary lane of inspection impermissibly extended the stop by questioning him about matters unrelated to his immigration status for the purpose of giving a service K-9 more time to conduct a free air sniff of the tractor trailer at a time when the agent was already satisfied that Mr. Tello was a United States citizen. In Rodriguez, which is a traffic stop case from 2015, the Supreme Court made clear that an officer cannot extend a stop even to a de minimis level to investigate matters unrelated to the purpose of the stop without reasonable suspicion or consent. As the Court explained, there can be no detours from the mission, and an officer cannot earn bonus time to conduct an unrelated investigation by completing all the traffic base increase expeditiously. But isn't one of the reasons for a border stop to determine how many people are in the vehicle? Yes, Your Honor, and when it comes to the Martinez-Fuente immigration inspection, which is the purpose of this particular immigration checkpoint, it consists of immigration-related questioning and requests for documents of the people in the visible spaces of the vehicle. So you would be ascertaining how many people are in the visible spaces of the vehicle? Wasn't one reason for the dog circling the truck to find out if there were some people hidden in the vehicle? The testimony was the dog was looking for people and presumably also looking for drugs, because that's what these dogs are trained to do. But the government rightly concedes that the canine sniff standing alone is beyond the justifying scope of the... I mean, why wasn't this within the scope is what I'm asking. Well, again, in Martinez-Fuente, the Supreme Court case which balanced the public interest against the private interest and made clear that at least for stops involving private motorists, the immigration inspection is limited to immigration-related questioning and getting immigration-related documents from the persons in the visible spaces, as I said before. So it's not for searching for hidden people? That's not the purpose of the immigration stop? That's correct, Your Honor. That's outside the justifying scope of the Martinez-Fuente immigration inspection. And the government, you said, has conceded in this case that it was beyond the scope? Yes. Or not? Your Honor, the government at page 17 of its brief concedes that a canine sniff standing alone is beyond the justifying scope of an immigration stop. And our position is that that's correct. In Martinez-Fuente, the Supreme Court said that a checkpoint stop intrusion on Fourth Amendment rights is quite limited because, quote, it involves only a brief detention of travelers during which all that is required of the vehicle's occupant is a response to a brief question or two and possibly the production of a document evidencing a right to be in the United States. Nothing about dog sniffs. In Machuca Barrera, an earlier case from this circuit, the court said that, quote, the justified duration of the stop was the amount of time reasonably necessary for the agent to ask a few questions about immigration status. Nothing about dog sniffs there. Same in Portillo-Aguirre. And in Ventura, another case from this circuit, this Court stated that we have determined the permissible duration for the stop was the amount of time reasonably necessary for agents to question the visible passengers and conduct brief checks of the buses, restrooms, and undercarriage luggage. Is it your position that it doesn't matter whether it was 30 seconds too long or 5 seconds too long? After it's done with its purpose, it's not the time that's an issue? Even one second could be too much? Or what is your position on that? That's correct. Even one second. If there's no, as Rodriguez made clear, and Rodriguez should apply in the immigration stop context, there's no detours, no de minimis exceptions, because the Supreme Court rejected the Eighth Circuit's de minimis exception for traffic stops. And it should apply in this case as well because there's no reason why Rodriguez shouldn't apply in this context. In cases such as Machuca, Barrera, and Portillo-Aguirre, the circuit has relied on principles from traffic stop cases, including the principle that the permissible duration of the stop is limited to the time reasonably necessary to complete a brief investigation of the matter within the scope of the stop. So it should apply in the immigration context as well, Your Honor. Does it matter that the border checkpoint isn't at the border but it's in Falfurrias Interior near Corpus? Does it matter at all for your argument? It will matter. This whole line of cases is related to interior checkpoints. Martinez-Fuerte was the case that said that these are permissible because of, as I quoted earlier, because it's a limited intrusion on Fourth Amendment rights and it's necessary for enforcing immigration policy, but it's a limited intrusion. So is it most limited at an interior checkpoint? Is that the most limited type of stop? Immigration. Yes, at immigration because there's at the border, which would— You have roving border patrol stops, which ought to require reasonable suspicion. Without reasonable suspicion, just everybody gets stopped. Is it most limited in an interior border stop? Yes, more so than the border, that's for sure. So again, Martinez-Fuerte is the case that said these things were okay. Now here, if you look at the facts of this case, what happened was Mr. Teo pulled his tractor trailer in the primary inspection lane at the Falfurrias checkpoint, which is about 70 miles north of the border, and Agent Villanueva and a canine handler were working in that lane. Agent Villanueva asked Teo if he is a U.S. citizen, and Teo replied that he's a naturalized citizen, and the agent was satisfied by that answer. He testified that he was, so he did not even ask for an immigration document. He didn't ask for proven citizenship. So objectively at this point, there was no other fact calling into question his citizenship status, so this initial exchange essentially ended the Martinez-Fuerte immigration inspection, which, as I said before, consists of immigration-related questioning and requests for documents. Why, I mean, but he could have requested the documents, and that could have given, even if it was for this ulterior motive, if he just had requested the documents, it would have taken the time, the 30 seconds or whatever, but he didn't. He was satisfied. If he had requested the documents and Mr. Teo had been fumbling around for the documents and they had been running the drug dog around the vehicle and the dog had alerted, that all would have been fine. That's like in Renierson where they took 30 minutes. I mean, I'd send it in that, but they took 30 minutes with the guy because he didn't want to open the window. Well, that would be a different situation than we have here. I mean, here we have a very quick, the officer very quickly determined that Mr. Teo is a citizen, but then the canine officer gives him this glance signaling to him that he needed more time. So the agent decided to buy more time for the dog to do the sniff. So the agent began asking Mr. Teo, what were you hauling in the trailer? That's a question about cargo, which there's no case that says that's an immigration-related question. And, in fact, the agent here testified that those were not immigration-related questions. What are you hauling and what stops you? The government seems to, I know you said that they concede on page 17 that it's not necessary, this canine sniff, but then they say that maybe these questions about the cargo or about public safety or something. Sure. I mean, you have, well, you have some cases that have said that questions about travel, including origin and destination, would be commonplace for an agent to ask. Of course, none of those cases say cargo, which was a question asked here. But, in any event, I mean, after Rodriguez, we know that the reasonableness of a seizure depends on what the police, in fact, do, and, therefore, the subject of the questions and the facts and circumstances coloring the interaction are relevant to the determination of whether the agent embarked on an impermissible detour. And I've cited Clark, a third-circuit case, which is a good example. We haven't applied the travel stop test to checkpoint border stops, have we? We have not applied. There's not been a case yet. And we've got a case, U.S. v. Alvarez, that applied our case in U.S. v. Matura, where we said the permissible duration of an immigration checkpoint stop is the time reasonably necessary to determine the citizenship of the person stopped, and this includes the time necessary to ascertain the number and identity of occupants of the vehicle, inquire about citizenship, et cetera. So, I mean, since the Supreme Court's travel stop case, we've continued to apply our immigration stop standard, it seems to me. Our argument is that Machuca-Berrera, that after Rodriguez, after the 2015 Rodriguez case, this court can no longer use a duration-based approach, that Machuca-Berrera was incorrect. Now that we know, in light of Rodriguez, that an officer cannot extend even to a de minimis level these kinds of searches. And as I said before, I mean, these immigration checkpoint cases, including Machuca-Berrera and Portillo-Aguirre, which was another case, this court has relied on principles from traffic stop cases, including this principle that the duration of the stop is limited to the time reasonably necessary to complete a brief investigation of the matter in the scope. It shouldn't have been much briefer than 30 seconds. Again, Your Honor, the test under Rodriguez is that, I mean, there is no de minimis exception, and it's a detour, and in this case, our argument is that in this case, the agent, in violation of the Rodriguez no-detour principle, went off on off-mission questions about the cargo, all for the purpose of giving this canine more time to sniff. And objectively, what happened here was that the only reason he asked these questions was because the canine handler gave him this glance indicating to him, I need more time. It was a tractor trailer as opposed to a minivan with people, which you obviously wouldn't say, what are you hauling? But, I mean, it's a tractor trailer, so, I mean, why isn't the question, what are you hauling? I mean, why isn't that just an innocuous inquiry on a big old tractor trailer, you know, pulled up there sort of? I know you're arguing the mendacious nature of the glance, but I'm just saying, you know, it's a huge tractor trailer pulled up there. You know, what are you hauling? I mean, construing the evidence in light, most people, too. I mean, why isn't that, like I said, if it's a minivan, you know, you wouldn't say, like, what are you hauling, right? But, I mean, for a big trailer, I mean, why does that? Your Honor, drivers of tractor trailers do have a reasonable aspect to patient and privacy in what's in the inside of the trailer. It wasn't suggesting to the contrary. And there are cases from the Sixth Circuit and the Fourth Circuit that say that. And in Ventura, which is a case from this circuit, this court recognized that the Martinez-Fuerte's limitation of suspicionless checkpoint inspections is to the visible spaces. And so the dog may be running around the tractor trailer, but those aren't visible spaces. And so that's essentially outside the justifying scope of the Martinez-Fuerte immigration inspection, which the Supreme Court said was permissible. Oh, it's more limited than the normal traffic stop in that way? Well, in a traffic stop, yes, in the duration, Your Honor. Not duration, but scope. Yes. Well, in a regular traffic stop, the police officer couldn't extend the stop. Well, Rodriguez, for example, I mean, the officer had stopped the motorist for a traffic violation but waited for another officer to get there so they could run the drug dog around. And the dog alerted in a part of the car. I think the drugs might have been in the trunk. But that was an impermissible extension of the stop. The Supreme Court said it was okay to delay it long enough to call in and check the registration of the vehicle, get his driver's license, check the registration of the car. So that's really beyond the scope of it. I mean, if you stop a guy for speeding, what does that have to do with asking him questions related to the reason for the stop? Well, because the Supreme Court said that you can't have these, there's only a tolerable duration for these traffic stops. And the tolerable duration is tied to the mission of the traffic stop. And those other things, checking the registration, license, whether there are outstanding warrants, the Supreme Court said those were sufficiently related to keeping motorists safe on the highway, which is all part of the traffic stop. But that would not be appropriate here. Those are not immigration-related questions. I mean, again, the Supreme Court could not have been more clear in Martinez-Fuerte that this is about immigration-related questions and obtaining immigration-related documents from persons in the visible areas of the vehicle. Do we have to reverse, if you're correct on this? Or could the government still win because other things were discovered and that sort of thing? We've argued that even though, yes, we argue that reverse was appropriate here, that the consent to search was not an independent – there was a subsequent consent, but it was not an independent act of free will sufficient to purge the detaint because he was still being unlawfully detained when the consent was asked for, and so there was close temporal proximity. Can you distress that more on rebuttal, please? Yes, yes. Thank you. Thank you. Thank you, Ms. Wilson. May it please the Court. Eileen Wilson on behalf of the United States. The district court's denial of the motion to suppress complied both with Supreme Court law and this Court's precedents. Immigration checkpoints are unique, and they're neutral. All vehicles have to be briefly detained to question people. Agents don't need a warrant, and they don't need individualized suspicion. This Court has made clear it will not scrutinize the particular questions that the Border Patrol agents ask at checkpoints, as long as they generally relate to determining citizenship. This Court repeatedly has refused to inquire into the subjective purpose behind a Border Patrol officer's questions. But the problem with this is objectively the Border Patrol agent has said these were not to determine citizenship. These were to delay long enough to get the drug dog there. This is a uniquely, extremely frank officer in his testimony, but he says, no, I wasn't doing this for any immigration purpose. I was doing this just to help the dog. And, Wilson, you're correct. I understand that's the testimony, Your Honor. But what's a little bit unusual here from your typical case is this is not a suppression hearing. This came up during a trial. And so a lot of these issues weren't fleshed out as you normally would have during a suppression hearing. For example, the handler wasn't there to testify because all they were doing was trying on the trafficking issues. But what we're doing by analyzing those very questions is exactly what the Court has said we shouldn't do, which is looking at the subjective purpose, looking at parsing the questions out. What if we're not looking at the subjective purpose? We're looking at the stated objective purpose. But under this Court's law, in Alvarez and others, and I believe you already pointed this out, the Border Patrol agent is entitled to look at the immigration-type papers and questions about cargo, questions about where you're coming from, where you're going, those types of things, regardless of what this agent says, this Court has recognized are immigration-related because, as we all know, that's where the Border Patrol agent often develops some type of suspicion because where he's coming from doesn't match up with where he's going or that type of thing. So it is a little bit unusual here. But the Court has said repeatedly in Machuca, and it relied on the Supreme Court of Martinez-Puerte, that it's the length of the detention, not the question asked, that controls here. How can that survive after Rodriguez? Well, Rodriguez, first and foremost, was a traffic stop. A traffic stop is more robust and has more freedom. So it would seem that this would even be more restricted. If it's said that in that context, then certainly it would apply in this context, which is more restricted to begin with. I don't think that's correct in the sense of the U.S. Supreme Court has said repeatedly that the need to make these checkpoint stops is great, that the United States has a great interest in policing its borders, and the consequent intrusion on Fourth Amendment's interest is quite limited. And the Supreme Court said that in Martinez-Puerte. And then this Court went forward in Machuca-Berrera looking at all those principles that were established. I don't see Rodriguez even citing Machuca-Berrera. In a traffic stop, you have to have some type of individualized suspicion. And the questions are measured against the mission of the stop. Are you saying we're bound to follow Machuca-Berrera even if we think that the law is now different? Well, no. A Supreme Court case can, of course, change it. But what I'm saying is Machuca-Berrera flowed from the United States Supreme Court in Martinez-Puerte, and that law remains sound. And that case involved checkpoint stops, which are completely different from traffic stops. And the facts, let's be frank here, the facts in Rodriguez were extremely different. In all total, it was a 29-minute stop. And after the officer had issued a ticket, seven to eight minutes elapsed while the other officer showed up so that he could run his dog. That is not at all like checkpoints. Checkpoints, when they come into the checkpoint, as this Court knows, everybody must stop. The dogs are there. As in this case, it was a simultaneous inspection. The dogs started running immediately. What we have in the record is that the handler indicated he needed more time. The district court may have interpreted that to mean that reasonable suspicion was brewing. And, again, because of this unique situation, meaning that this arose during a trial as opposed to pretrial where a suppression hearing is normally held, it was a little more limited. I hate to keep using that word. But the government did it for the burden, didn't it? Of course it did. And so you could put on, the Court didn't say you can't put on this burden. I agree with that, and I do understand that, and there's no question about that. But, again, Machuca flows from Martinez-Fuerte. Let me ask you a hypothetical. What if the canine handler is having a bad day or the canine itself is having a bad day? And so it's moving really slowly. And so instead of this taking 30 seconds, it takes five minutes because it's just slow that day. They're tired and it's not immediately doing anything. Or the same type of thing. What if they're in a different lane and it's taking a while to call the drug dog over because they have something in this other lane and there's not enough of them there at the time? So it takes 10 or 15 minutes. Is there a limit to this argument that you're making? Well, what I'd like to point out is this Court has said this. Excuse me, Martinez-Fuerte said this, and the Supreme Court also said this in Rodriguez. And that is that we continue to use the words reasonable duration cannot measurably prolong. That's what the Court said in Rodriguez in 2015. Okay, I'm asking you in the hypothetical, is it reasonable to wait 15 minutes for the drug dog to get through doing its other job while the guy is sitting there? Fifteen minutes is obviously longer than it was in Rodriguez, but it's supposed to be immigration inspection as opposed to drugs. Okay, so is the answer to the hypo that would be too long, but this is only 30 seconds? Well, I think it would depend on the facts. Well, I'm asking you. I've given you the facts. Is 15 minutes too long? I think that, yes, probably would definitely be too long. Five minutes? Five minutes. There are cases that have upheld five minutes. And I believe Martinez-Fuerte may have been one of those cases. So where do you believe the line is? Do you think it's duration-based? Where is the duration at which that type of hypothetical becomes too long? I think that the Court is always going to have to look at the particular facts, and the facts are going to drive it. For example— Okay, we've given you the facts. In this type of scenario, is 10 minutes the magic number? Five minutes? I think that's irrelevant here because it's undisputed that it was 30 seconds total. And this Court has repeatedly found durations longer than— So you want to answer the hypo? I'm sorry? You want to answer the hypo? No, I did answer the hypo. The hypo, the 15 minutes, yes, I'm sure would be. 15 minutes is too long, but 10? Under Rodriguez, if you're going to apply the traffic stop. But this is a checkpoint. I think that if an officer were to testify that he was asking questions and the fellow said that he was going to go to Houston, but really he's on a road from Laredo and he's going to take an alternative one. Now, if the officer continues to ask questions along those lines, 10 minutes is fine because based on the answers that are being given, he's developing the reasonable suspicion. And I think there's a lot of cases that would support that. But that's not what was happening here. No, and, of course, here is very different. I agree with that. But I don't think there is a magic number. And I think all these cases that have looked at that, that is why they're using reasonable duration, tolerable duration, as I said was used in Rodriguez, as was you cannot measurably prolong. Rodriguez did not say 5 minutes is too long, 10 minutes is too long, 15 minutes is long. But what we come out with in Rodriguez is that the 7 minutes, 7 to 8, between issuing the ticket and waiting to run the dog, the court said that did not fly. And, again, the traffic stops are different from the checkpoint stops. I wanted to ask you that. Did you concede that looking for hidden illegal aliens in the vehicle is beyond the scope of this stop? No. In page 17 of the brief, I actually quoted footnote 21 from Machuca Barrera, and it said a canine air staff sniff standing alone is beyond, but the canine can search for immigration, drugs, and whatnot. And as Rodriguez said, the critical question is not whether the sniff occurs before or after the purpose of the stop is completed, but whether conducting the sniff prolongs the stop, which is somewhat interesting, right, because it's saying you can do it after the stop, but you can't prolong the stop. So sometimes the verbiage in these cases is a little vague, a little broad, whatever you want to call it. But the whole purpose of these immigration checkpoints is to find illegal aliens. You can't set them up as a general criminal, like let's say we're looking for heroin or something. Obviously that happens a lot. But the purpose is to check for the illegal aliens, and that's why you're allowed to run these dogs. And some dogs specialize in drugs. Some specialize in currency. But, of course, what we see here in Texas a lot are they're running for immigration because that's where we have so many of these checkpoints. In the cases they cite in Tennessee and New Jersey, I suspect they have no checkpoints. And, of course, we don't. We have the rule of orderliness here. But Rodriguez didn't change the law regarding checkpoint stops. Obviously Fourth Amendment principles apply, but the rules regarding traffic stops are different, and there's a significant difference between the traffic stop where you have to have individualized suspicion versus a checkpoint where everybody has to stop. We're all on equal terms. So are you arguing that you simultaneously arguing that Rodriguez doesn't apply here, but also arguing that under some of the language in Rodriguez this would be okay? I'm trying to figure out because those two sentences. What I'm saying is, of course, the Fourth Amendment general principles out of Rodriguez are going to apply, but the law regarding traffic stops is different than the law regarding checkpoint stops. Under Rodriguez would this be okay if Rodriguez applied here? If Rodriguez applied here? Yes, if Rodriguez, if you take the case and you say this applies to this situation, is it okay or not? Does it prove of what happened in this situation? I think it would be because where they got into trouble in Rodriguez was the seven to eight minute delay between the issuance of the ticket and then running the dog. But the issues are different in the traffic stop versus the roving border patrol versus I want to come in your house with a search warrant. And there are all these different considerations. And so, again. Is the scope of an immigration stop broader than the scope of a traffic stop? Absolutely. You have, yes. And the Fourth Amendment concerns are much more limited. The Supreme Court has continued to tell us that. Because, again, the United States has a very strong interest in enforcing its borders. But isn't that exactly the opposite? You have much less freedom of what you do at the immigration stop. The police officers can do more at a regular traffic stop based on reasonable, articulate suspicion than what the immigration stop person can do. They can only do things directly to determine citizenship, and then they're supposed to move on. Well, but as we see in so many of these cases, as they're determining citizenship based on the answers or the cargo or what have you, that they're developing reasonable suspicion where then they can be sent to secondary. And, of course, they can be sent to secondary for any reason we know. This person wasn't sent to secondary for reasonable suspicion. Say what? This person wasn't being sent to secondary because they had developed reasonable suspicion. We do know that the handler at one point indicated whether orally or sent him a visible signal that this fellow needed to go to secondary. So, yes, reasonable suspicion had been developed. I think that's undisputed in the record. Or the reasonable suspicion was existing. That's the reason for the drug. I don't believe that's in the record. Maybe we're not. Say that again. I don't believe that the record supports. Show me where in the record it says that it was okay to have the drug dogs come because they had developed a reasonable suspicion. No. As opposed to just we're going to look for something. No, no, no. Those are not the facts. The facts are as soon as the semi came into the checkpoint, the dog started running, and Agent Villanueva started asking Mr. Tello questions. Those are the facts. Then during the dog run, we have two things in the record. One, that the handler indicated he needed more time. This is according to Agent Villanueva. And second, at some point, obviously less than 30 seconds, the handler indicated to Agent Villanueva that Mr. Tello needed to be sent to secondary. But that's after. He's keeping him longer to ask him questions before the determination is made that he needs to go to secondary. I agree that there is testimony to that effect. But what I'm also saying is the handler had indicated to him he needed more time, and that's why he asked more questions. How much time elapsed between the time the handler asked for more time and the dog sniffed? I would say mere seconds. We have no idea because all told, between the initial encounter and the obtaining consent, it was 30 seconds. So when the 70 up here, the trailer pulls in. It's a big tractor trailer. So when the agent, the driver remains still in his seat in the trailer. Yes, they don't get out. I mean, we don't have evidence of that, but they don't get out. So there's a conversation going on with the driver outside. He's in the trailer. Okay, so the canine officer, so is he or she with the canines at the back of the trailer? Did you say back? I'm trying to pick up on how it's eye contact. All we know from— Or the signal. If the officer is talking to the driver, the cab in front of the truck, when the truck pulls in, you say the canine sort of immediately go to. That's routine, right? It's standard, yeah. Standard procedure. So they're going to the back of the truck? Well, they run the whole thing. They do a circle. So they start doing a circle. So I don't know if they're starting in the front or in the back. I don't know. Well, I was trying to visualize this. Yes. This signal given between the handler and the driver. He's up in the cab and so forth. Right. How this is all happening within 30 seconds. Agent Villanueva says that he is aware of the handler when he's doing these inspections in these checkpoint lanes, which makes sense, right, because they're working in tandem. And it's not a situation where you're calling over a dog later or what have you. They have a predetermined signal for I need more time here. What does he say? That's not in the record, but typically, yes, they do. He said he signaled that the handler signaled that Mr. Teller should be sent to secondary. Agent Villanueva could not remember whether it was audible or some type of hand signal. It would have been good to have the handler testify here. I think we all agree with that. Ted, can you win even if the search was prolonged? Can I win if the search was prolonged? In other words, if you reject the Machuca Barrera and all that? If we hold Rodriguez has changed the landscape, just hypothetically, do you win anyway on the consent or do you agree that you lose if you don't? Well, I realize that I have a temporal proximity issue, but I would contend that they did not brief it in much detail. I think we both believe the dispositive issue here is the stop. So you're not saying you win? Well, I think, yes. His consent was knowing and voluntary. He agreed to go there, and there's no evidence to the contrary. Because, number one, the agent, the handler, had suggested he go to secondary, which is enough. But they always, as a practical matter, ask if the driver will consent. If we have that, why are we spending all the time on this? Maybe you should ask Mr. Martin. No, seriously. I mean, isn't it your job to say we win anyway? Well, we do win, and I said that in the brief. But I do believe that Martinez-Fuerte, which is the United States Supreme Court, remains, for checkpoints, remains sound law under Post-Rodriguez, as evidenced by the fact that Rodriguez was in 2015, and this Court has continued to apply Martinez-Fuerte and Machuca-Barrera, and I set forth all those cases in my brief, that it remains good law. All right. State for me, just in a declarative sentence, what is the nature or extent of the government's, quote, concession, close quote. When you were asked that earlier, you went to page 17 of the brief and you read language. I just want to hear from you what is it you conceded vis-à-vis the issues in the case. I didn't concede anything. I quoted— That's what I'm trying to—hold it. I'm going to ask you the brief in a brief. That's precisely my question. He says you conceded on page 17 of the brief. When you were asked, you read what's in the brief on page 17, and I'm asking you not to reread me what's on page 17. I'm trying to understand, did the government concede anything, and if so, state clearly what the limited scope of the concession. That's what I'm asking. Are you with me? No, the government did not concede anything. The government merely quoted the statement in Machuca Barrera at footnote 21. The government's contention is, and the case law supports it, that the use of dogs in order to detect illegal immigration is fine. Okay. So you leave the podium having made no concessions. Is that accurate? That's correct, Your Honor. I'm not trying to hem you in. I'm just trying to make sure. So when he comes back up here and says he conceded, that we know on the record you say you didn't. All right. No. I just was forthright about the footnote in Machuca. All right. All right. Thank you, ma'am. All right. Mr. Moten, you're back up. Rebuttal, if you need it. Conceded. What about the consent issue? Before you. Ms. Wilson. The consent issue. Okay. Our argument, and it's true, that the consent was not an independent act of free will sufficient to purge the taint of the constitutional violation because, as Ms. Wilson says, there is a close temporal proximity. This only happened as a 30-second stop here. There was no break in the causal chain between the agents. Did he concede that 30 seconds is the operative time frame? It was 30 seconds from stop to consent. I mean, the matter was improperly extended much shorter than that. I mean, it's a matter of four or five seconds probably, right? The record's unclear how long it was. That's the time you're talking about is how long was the stop extended? From the point at which he was satisfied that Mr. Tay was not a citizen, did not ask for immigration stop, saw a glance from the officer indicating to him more time until the officer said to secondary the vehicle, the canine handler said secondary vehicle, and in the interim the agent was asking off-mission questions about the cargo to give the dog more time to sniff. There was no break in this causal chain between the agent's illegal detention of Tayo to buy time for the dog to conduct this sniff, and then the handler signaling to go to secondary, presumably because the dog alerted, and then the agent asked for consent to search. So essentially the agent in the primary inspection lane is exploiting the delay for the purpose of getting consent to search the vehicle. And he says, I mean, he even testifies that, you know, that's what he was doing, that basically when they have the he's working with the handler and the handler tells him to give more time to search. That's what he did. But the test for consent is different than the Rodriguez test, you know, about it's not a long delay. He's not being held. He's not keeping his driver's license. There's nothing that's coercive about the consent. That's true, Judge Elrod, but it's not just voluntariness. There's two prongs here. There's voluntariness, which is what you're talking about. There's no coercion here. We're not arguing this. There's no coercion. But the government also has to satisfy that it was an independent act of free will. And the factors there are temporal proximity, the presence of intervening circumstances, and the purpose and flagrancy of the initial misconduct. And you can find that standard in Macias, which we cited in our brief. Right, but none of those factors cut your way except perhaps for temporal proximity, do they? Well, as I just explained, Your Honor, there was no break in the causal chain here. The delay was exploited for the purpose of to get the consent. That's temporal proximity. Well, they go together. I mean, it is, there's no, well, it goes to the purpose and flagrancy of the initial misconduct. It's not, you see these cases with consent that's not appropriately given. How is this a flagrant case of trying to get someone's consent compared to those cases? Well, because he was satisfied that he was a U.S. citizen and continued to detain him for the purpose of letting a canine handler run the dog. And as Martinez-Fuerte tells us, and I'll read it here. Could he have said no and driven off? Yes. I'm sorry? Could he have said no and driven off? No, he was detained. So he could not have said no. No, no, he's trying to pass through the immigration checkpoints. Right, so if he had not consented, he would not have been able to drive off at that point. I don't believe so. And, Your Honor, in Martinez-Fuerte, the whole reason that these stops are okay, this is the Supreme Court saying here that the stop does intrude to a limited extent on a motorist's right to free passage without interruption and arguably on their right to personal security, but involves only a brief detention of travelers during which all that is required to the vehicle's occupants is a response to a brief question or two and possibly the production of a document evidencing a right to be in the United States. And here the agent was satisfied that he's a U.S. citizen and didn't ask for a document, but because the canine handler, telling him to keep asking off-mission questions, to give me some time here, and that was flagrant in our position. And it was outside the scope of the Martinez-Fuerte inspection. There was no break in the causal chain, and the agent was exploiting the delay for this purpose. All right. Thank you. Thank you, Your Honor. Thank you, Ms. Wilson, Ms. Martin, for the oral argument. The case will be submitted.